Present:  All the Justices

NORFOLK SOUTHERN
RAILWAY COMPANY
                          OPINION BY JUSTICE A. CHRISTIAN COMPTON
v.  Record No. 960533            January 10, 1997

CLINTON TRIMIEW

           FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                    Randall G. Johnson, Judge

     On August 20, 1993, appellee Clinton Trimiew, the plaintiff
below, was injured while working for appellant Norfolk Southern
Railway Company, the defendant below, near Burkeville in Nottoway
County.  The plaintiff brought this action against defendant
under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51
et seq., to recover damages for his injuries.

     The plaintiff alleged that he was injured during "his
attempt to alight and exit from the passenger side cab of a high
rail vehicle which ran along the railroad track."  He asserted
that "[u]pon alighting from the vehicle, he suddenly slipped on
excessively high and ungroomed ballast rock which lined the track
area just outside his vehicle."  He alleged the defendant
negligently failed to provide him a safe place to work,
negligently "failed to inspect, find, and warn Plaintiff of a
dangerous condition," and violated its "own standards as to the
proper grooming and placement of ballast rock along the railroad
line prior to Plaintiff's accident."

     In a grounds of defense, the defendant denied the
allegations of primary negligence, alleged the plaintiff's
injuries were caused solely by his own negligence, and asserted
the plaintiff was guilty of contributory negligence.

The case was submitted to a jury during a two-day trial in December 1995 upon the issues of primary and contributory negligence, proximate cause, and damages. The defendant did not move to strike the plaintiff's evidence either at the conclusion of the plaintiff's case-in-chief or at the close of all the evidence. The jury found in favor of the plaintiff and fixed the damages at $500,000.

Following announcement of the verdict, the defendant moved the court to set the verdict aside upon the ground that the plaintiff had failed to prove the defendant was negligent. See Gabbard v. Knight, 202 Va. 40, 43, 116 S.E.2d 73, 75 (1960) (in testing sufficiency of evidence, defendant has option of making a motion to strike the plaintiff's evidence or awaiting the jury's verdict).

The trial court denied the motion and entered judgment on the verdict. We awarded the defendant this appeal, limited to consideration of whether the trial court erred in denying defendant's motion to set aside the verdict and in ruling the evidence was sufficient to present a jury issue upon the question of defendant's negligence.

Recently, we summarized the settled principles applicable to cases of this type. We apply federal decisional law, because whether negligence has been established for purposes of the FELA is a federal question. Drawing on federal law, we have noted that a plaintiff's proof must justify with reason the conclusion

- 2 -

that an employer's negligence played any part, even the slightest, in producing the injury for which damages are sought. Norfolk and W. Ry. Co. v. Johnson, 251 Va. 37, 43, 465 S.E.2d 800, 805 (1996). Reasonable foreseeability of harm is an essential ingredient of FELA negligence. Id. at 43-44, 465 S.E.2d at 805. Ordinarily, the issue of FELA negligence is a question of fact to be decided by the jury. Norfolk and W. Ry. Co. v. Hodges, 248 Va. 254, 260, 448 S.E.2d 592, 595 (1994). However, in the rare case when fair-minded persons cannot differ on whether the employer was at fault and whether that fault played any part in the employee's injury, the question becomes one for the court. Stover v. Norfolk and W. Ry. Co., 249 Va. 192, 199, 455 S.E.2d 238, 242, cert. denied, ___ U.S. ___, 116 S.Ct. 186 (1995).

Under the FELA, an employer has a nondelegable, continuing duty to exercise reasonable care in furnishing its employees a safe place to work. Johnson, 251 Va. at 44, 465 S.E.2d at 805. The employer must conduct proper inspections to discover dangers in places where employees are required to work, and must take reasonable precautions for the employees' safety after determining the existence of such dangers. Id. But even under the FELA, an employee still must establish that the employer was guilty of some act of negligence in order to recover. Norfolk and W. Ry. Co. v. Hughes, 247 Va. 113, 116, 439 S.E.2d 411, 413, cert. denied, ___ U.S. ___, 114 S.Ct. 2136 (1994).

Examining the facts of this case against the background of the foregoing principles, we hold the evidence was insufficient as a matter of law to raise a jury issue upon the question of defendant's negligence.

Rules of appellate procedure require us to consider the facts, some of which are disputed, in the light most favorable to the plaintiff, who is here armed with a jury verdict confirmed by the trial judge. During daylight hours in August 1993, the plaintiff was riding in the passenger seat of the cab of a "high rail" vehicle operated by Robert Forsythe on defendant's track. They were inspecting the track near Burkeville. The plaintiff, employed by defendant for 20 years, was a track laborer. Forsythe was one of defendant's assistant track supervisors. A high rail vehicle is "just a regular truck" that has the capability of being operated on a highway or a railroad track.

Forsythe stopped the vehicle to cut bushes near the track. He alighted from the vehicle's left side and the plaintiff, after putting on his hard hat and gloves, began to alight from the right side, apparently to assist Forsythe in clearing the bushes.

According to the plaintiff, the ground where he was to step from the vehicle "looked safe to get out." Holding to the vehicle for support, the plaintiff then stepped on ballast rock lying along the track. He testified that as he stepped down, the "ballast just went from under me, like, if you were to step on a pile of marbles." The plaintiff "landed down" in an adjacent

ditch and felt "something pop" in his back.

Ballast, in this context, is stone laid on the roadbed of a railroad track for the purpose of stabilizing the track and facilitating drainage. According to defendant's written standard procedures on the use of ballast, its purpose is "to provide adequate drainage and afford a means of maintaining proper cross level, surface, and alignment for the track under load." The stone is commonly known as "2 inch ballast" or "3/4 inch ballast."

Ballast is unloaded from the sides of a slowly moving, multi-car train. A "berm" of ballast is laid beside the track and outboard of the "head" of cross-ties supporting the track. After laying, the berm generally is eight to twelve inches above the top of the rail. When ballast is piled to this level, "it makes for a difficult walking surface." These mounds of ballast are smoothed and "groomed" by a machine called a "ballast regulator." When groomed, the ballast supporting a level track is even with the level of the cross-tie for six inches and then slopes downward away from the cross-tie.

The evidence showed that railroads periodically must replace old cross-ties and resurface sections of track. This is called a "timbering and surfacing" (T & S) operation. Before a scheduled T & S operation, ballast that will be used in the project is unloaded. The piles of rock are left in an ungroomed condition until the old ties are replaced during the T & S operation, after

which the ballast is groomed to the prescribed profile.

In the present case, ballast was unloaded in March 1993 along a stretch of track that included the site of the plaintiff's fall, which occurred about five months later.  The dumping of the rock was described as "unusual" because it was frozen and did not flow smoothly from the ballast train.  The ballast came out "in chunks" and piled up along the rails, leaving "big piles here, big piles there," according to one witness.

The unloading was in advance of a T & S operation scheduled for the summer of 1993.  Because of "budget reasons," the T & S operation was postponed until "the next year, or possibly the year after that."  Thus, the ballast remained as it was dumped along the track up to the time of plaintiff's fall.

The plaintiff's evidence showed that an operational ballast regulator owned by defendant was stored on a railroad sidetrack about three miles away from the site of this accident and that employees of defendant qualified to operate the machine were available.  Two witnesses who had operated a ballast regulator in the past testified that it would take four to five hours to "smooth out" the approximately five or six miles of ballast that had been dumped in March.  Additionally, the plaintiff's evidence showed that a timbering and surfacing "gang" was "usually" scheduled within one to three months of dumping to "come through to smooth the ballast."

The plaintiff participated in the March unloading project and had passed the area where he fell on work days prior to the day of the accident. He testified he knew "ballast was in that general area," but that he "had never stopped" there before the day he fell.

On appeal, the plaintiff contends the trial court correctly refused to set the verdict aside because the plaintiff "proved multiple theories of negligence." Initially, the plaintiff argues that his immediate supervisor, Forsythe, "failed to warn him that there were unusually high mounds of ballast rock in the area where the supervisor chose to stop the high rail vehicle." Continuing, he says that even though he participated in the March ballast dumping operation, "it should be remembered that he worked along 105 miles of track, and that he often worked in the area of crossings or rail switches," areas where the evidence showed "the ballast train had not dumped unusually high mounds of ballast." He notes that because assumption of risk has been abolished under the FELA, 45 U.S.C. § 54, "the railroad cannot be exonerated from liability simply because Trimiew participated in dumping the stone five months earlier."

In addition, the plaintiff argues that because defendant knew the T & S gang would not come through Burkeville at all during 1993 and because it was aware of the danger of the unusually high mounds, it was incumbent upon defendant to groom the ballast promptly. According to the plaintiff, "the

preventive measure to correct the dangerous condition was so simple, a four or five hour work assignment, . . . there was plainly a basis for the jury to determine that the railroad was negligent in failing to assign a worker to operate this ballast regulator to smooth the ballast mounds."

Also, the plaintiff contends defendant should have trained him "about dismounting from a high rail vehicle into unusually high mounds of loose ballast." The evidence showed that, prior to plaintiff's fall, defendant maintained no written safety rule or informed the plaintiff about "how a worker's arms and legs are to be positioned prior to exiting from the cab of a high rail vehicle."

We reject each of the plaintiff's "multiple theories of negligence." The FELA "does not make the railroad an absolute insurer against personal injury damages suffered by its employees." Wilkerson v. McCarthy, 336 U.S. 53, 61 (1949). And, under the FELA, the weight of the evidence must exceed a scintilla before the case properly may be left to the jury's discretion. Stover, 249 Va. at 200, 455 S.E.2d at 243 (citing Brady v. Southern Ry. Co., 320 U.S. 476, 479 (1943)). If, without weighing the credibility of the witnesses, the evidence supports "but one reasonable conclusion as to the verdict," the court should decide the matter, thus saving the result "from the mischance of speculation over legally unfounded claims." Stover, 249 Va. at 200, 455 S.E.2d at 243 (quoting Brady, 320 U.S. at

479-80) (internal quotations omitted).

In the present case, the record is devoid of proof, lay or expert, that there was anything improper in the manner the ungroomed ballast was situated along the track. In his argument, the plaintiff dwells on the erroneous conclusions that the ungroomed ballast was "excessively high" and "dangerous." All the evidence was to the contrary; the ballast where plaintiff fell was at the normal height for ungroomed ballast. The berm is generally eight to twelve inches above the top of the rail on each side of the track, and that was the condition, according to all the evidence, that existed at the point of plaintiff's accident.

There was no proof that the plaintiff fell on any of the previously frozen "chunks" or lumps of stone discharged during the March unloading. Indeed, the plaintiff submitted as evidence photographs he had taken of the "exact area" of his fall, and these photos do not show ballast lying in "chunks" or lumps; they merely show a smooth, constant mound of ballast piled along the rails.

Workers like this plaintiff were fully aware of the normal condition of ungroomed ballast from long railroad experience and from participating in unloading the very ballast upon which the plaintiff fell; they knew that ungroomed ballast was "difficult" to walk upon. Thus, given these facts, there was no basis for the defendant to foresee that the ballast, laid in routine

fashion for miles along track in open country, posed an unreasonable danger to employees such as this plaintiff.

Because the berm of ballast lay in a normal condition, the length of time the rock remained ungroomed becomes irrelevant upon the question of any alleged negligence charged to the railroad for failing to timely groom the rock with a ballast regulator. The ungroomed ballast where plaintiff fell, according to the uncontradicted evidence, was in the same condition and degree of stability the day after it was spread as it was five months later on the day of the accident. As the defendant argues, under the plaintiff's theory the railroad should have scheduled a special operation to groom the ballast when the original T & S operation was postponed, and then repeated the entire ballast unloading process when the T & S operation was rescheduled. To find that the railroad owes a duty to its employees under these circumstances to regulate ungroomed ballast, a known condition, in a specified period of time is to reach the unreasonable conclusion that the railroad may never spread ballast in anticipation of a T & S operation for fear of being found liable for an employee's injuries sustained during a perfectly routine maintenance project.

There are a number of reported cases decided in other jurisdictions under the FELA involving falls by railroad workers on ballast, none of which is persuasive because they are factually inapposite to this case. See generally, e.g., Atl.

Coast Line R.R. Co. v. Gunter, 229 F.2d 842 (5th Cir. 1956);
Seaboard Air Line R.R. Co. v. Gentry, 46 So.2d 485 (Fla. 1950);
Hahn v. Norfolk and W. Ry. Co., 375 N.E.2d 914 (Ill. App. 1978);
Harp v. Illinois Cent. Gulf R.R. Co., 370 N.E.2d 826 (Ill. App. 1977).

Finally, the plaintiff complains on appeal of the failure of the defendant to instruct him or provide written rules about the safe method of dismounting a high rail vehicle. The plaintiff did not present this theory of negligence at trial; there was no such allegation in the motion for judgment and there was no instruction that would have allowed the jury to make a finding against the defendant on this subject. As a matter of fact, plaintiff's failure to properly dismount the vehicle was an issue raised by the defendant and presumably was considered by the jury on the contributory negligence question. Thus, we shall not discuss the issue further.

Accordingly, we hold that the trial court erred in denying the defendant's motion to set the verdict aside. Thus, we will reverse the judgment for the plaintiff and enter final judgment here in favor of the defendant.

Reversed and final judgment.